Filed 6/20/19 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | E069088 |
| Plaintiff and Respondent, | (Super.Ct.No. INF1401840) |
| v. | |
| JOSEPH GENTILE, JR., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT

The court has reviewed the petition for rehearing filed June 13, 2019.  The petition is denied.  The opinion filed in this matter on May 30, 2019 is modified as follows:

1.  On page 17, at the end of the second full paragraph, which extends to page 18, add the following:

As an active aider-abettor, or as the actual killer, no resort to the natural and probable consequences theory applies.  The theory of vicarious liability was only required to support the first degree murder conviction, which is no more.

There is no change in the judgment.

1

CERTIFIED FOR PUBLICATION



RAMIREZ
P. J.


We concur:

McKINSTER
J.

CODRINGTON
J.

2

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E069088 |
| v. | (Super.Ct.No. INF1401840) |
| JOSEPH GENTILE, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Graham A. Cribbs, Judge. Affirmed.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Joseph Gentile, Jr.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles Ragland, Lynne McGinnis, and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Joseph Robert Gentile of first degree murder in connection with the 2014 beating death of Guillermo Saavedra by means of using a golf club, wooden

1

chair, and a beer bottle.  The prosecution's main witness testified upon a grant of use immunity, but, depending on which statements the jury believed, she may have actively participated in the beating using those implements.  The jury found untrue an allegation that defendant used a deadly or dangerous weapon, and he was sentenced to 25 years to life.

We reversed that conviction for instructional error pursuant to the Supreme Court decision in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), because the jury was instructed it could convict defendant under a natural probable consequences theory, one of two theories supported by the evidence, and remanded the matter for the People to decide whether to accept a reduction to second degree murder, or to retry defendant for first degree murder under theories other than natural and probable consequences.  (*People v. Gentile* (Feb. 27, 2017, E064822) [nonpub. opn.](*Gentile I*).)

On remand, the People accepted the reduction to second degree murder and defendant was resentenced to an indeterminate term of 15 years to life.  Defendant appealed again, raising the issues we had left undecided in the first appeal, affirming the judgment as modified by reducing court facilities assessments.  (*People v. Gentile* (Nov. 15, 2018, E069088 [nonpub. opn.](*Gentile II*).)  Defendant then petitioned for review arguing that he was entitled to a reversal of his murder conviction pursuant to Senate Bill No. 1437.

The California Supreme Court granted review and transferred the case back to us with directions to vacate our decision filed on November 15, 2018 in defendant's second

2

appeal, and to reconsider the cause in light of Senate Bill No. 1437, and our determination in the defendant's first appeal that it was probable the jury convicted defendant of murder on the theory he aided and abetted Saundra Roberts in a target crime that, as a natural and probable consequence, resulted in her murder of the victim. (See *Gentile I*, *supra*, E064822, pp. 12-14.)

After reconsidering the matter in light of Senate Bill No. 1437, we again affirm.

## BACKGROUND

We take the facts from our previous opinion[1], *Gentile I, supra,* E064822, pages 3-11, with additions based on subsequent procedural history:

*Objectively Established Facts*

The undisputed facts show that prior to June 21, 2014, Guillermo Saavedra lived in the back of the La Casita restaurant in Indio, acting as property caretaker and handyman. On June 23, 2014, at 7:30 a.m., the owner of the property and his son happened to drive past the restaurant and noticed the lights were on, which seemed unusual. They entered the restaurant when Saavedra did not respond and found Saavedra laying on the floor, dead. Outside, in the parking lot, they found Saavedra's cell phone. The police were contacted.

When they arrived at the restaurant, the police found the victim's body, along with a broken chair, a golf club, a wooden stick with blood, and a broken bottle near the body.

---

[1] In a separate section we address the various statements of the witnesses because the divergent accounts of the offense led to the competing theories of defendant's liability for murder.

The victim's cell phone was found in the grass just north of the building. Investigators documented three sets of bloody footprints, at least one of which was a shoeprint, and one of which appeared to have been made by a sock or bare foot. Detectives also collected surveillance videos from the Royal Plaza Inn and from the nearby laundromat. The police obtained and executed various search warrants after viewing evidence on the surveillance tapes of the nearby Royal Plaza hotel and the laundromat. After reviewing those surveillance videos, police officers visited the areas and found a sock on a bush at the property located between the hotel and the laundromat. The sock appeared to have a reddish-brown substance on it.

Also undisputed are certain movements by defendant and his estranged wife, Saundra Roberts, captured on the surveillance videos. At 1:03 a.m. on June 22, 2014, the defendant approached the night entrance of the Royal Plaza Hotel in Indio and pressed the buzzer. Defendant then went to the door of the hotel manager's apartment, seeking to rent a room. He appeared intoxicated, so the manager declined to rent him a room, although defendant and Roberts were regular tenants, renting a room from her two or three times per month.

The hotel manager also managed the coin-operated laundry located near the hotel. Surveillance video from that location showed Roberts talking with her on-again-off-again boyfriend, Stephen Gardner. Gardner had been contacted by Roberts, who asked him to bring a pair of shorts, a shirt and socks to the laundromat. Roberts sounded panicked, so Gardner thought she was in trouble. He took the clothes to the laundromat where he

4

found Roberts with defendant, which made him angry. The defendant appeared to be wet, and his hands were red.

The victim suffered multiple fractures of his ribs, collarbone, and parts of the spinal structure, as well as lung hemorrhage. The injuries would have required significant blunt force. From the nature of the injuries, the pathologist opined that multiple blunt impact injuries caused the death. The pathologist also noted that the victim had coronary disease that may have led to heart failure, as a result of the beating. The injuries to Saavedra were probably inflicted with fists, a golf club, a beer bottle, and a chair. The pathologist described the cause of death as a heart attack caused by multiple blunt force injuries.

DNA testing of the blood on the sock and the head of the broken golf club matched the victim, Saavedra. There was also DNA that was consistent with defendant's profile as a minor contributor on the sock, as well another person's DNA, which the analyst could not identify due to the complex nature of the mixture. A cigarette butt recovered at the scene contained a mixture of Roberts' and Saavedra's DNA. A second cigarette butt had only one DNA profile, belonging to Saavedra, while a third butt had defendant's DNA on it. Swabs from the golf club head were analyzed and found to contain a mixture of two persons' DNA, but the profile belonging to Saavedra was the only one that could be identified. The swab from the golf club grip had DNA from three people.

5

*In Court and Out of Court Statements*

Roberts gave various accounts of the events. At trial, she testified that she called defendant for help moving from Stephen Gardner's residence on Friday, June 21, 2014, so defendant sent a young man with a truck to move her belongings. She was moving her belongings to the restaurant at which Saavedra, her dear friend, worked security and lived. The restaurant was her "safe house" when she was "at odds" with Gardner. Roberts wanted to introduce defendant to Saavedra because Saavedra wanted to meet defendant. Saavedra wanted to meet defendant because they both had backgrounds serving in the Marines. Later, Edward Cordero, one of defendant's house mates, dropped defendant off at the restaurant.

At the restaurant, the three people drank many beers and martinis over the evening. At one point, Roberts went out to purchase more alcohol, and when she returned, the defendant and Saavedra were still in conversation. At some point, the two men raised their voices at each other, but they did not fight. Eventually, Roberts felt both drunk and like a third wheel, so she left the two men and went to her homeless camp to sleep it off. When she left, there had not been any fighting.

In this version, Roberts indicated that she awoke at around 1:00 or 1:30 a.m., and went to a nearby AM/PM store to buy cigarettes; when she came out she saw defendant across the street at the Royal Plaza Inn hotel. She saw him walk through the parking lot and was curious why he had not gone home. Defendant told her he was trying to get a

6

room at the hotel but was unsuccessful. Defendant was dressed in the same clothes he had worn earlier but his clothes appeared wet.

For this reason, Roberts contacted Gardner and asked him to bring her some clothes at the laundromat. Gardner was unaware that Roberts wanted the clothing for defendant, so he was surprised and angry to see defendant at the laundromat when he showed up with the items. Gardner brought a pair of shorts, a tie-dyed tee shirt, and a single sock.[2] Later, Roberts went to Gardner's place but he ran her off because he was angry. She went back to her homeless camp to sleep and that was the last she saw of defendant or Gardner.

Prior to trial, Roberts gave three other and different statements during interviews with police. In the first pretrial statement, Roberts testified she was living at the restaurant where Saavedra worked, although her relationship with the victim was purely platonic. She did not mention defendant sending a young man with a truck to move her to the restaurant. On Saturday, the defendant called her and wanted to meet with her and get a room with her, although she said it had been 16 months since she had been with defendant.[3] In this version, Roberts indicated she went to Saavedra's place, spoke of the martinis she had made, and discussed how defendant and Saavedra talked about their

---

[2] Gardner had left one sock in his van when he delivered the clothing.

[3] There is actually some corroboration for this statement, because the hotel manager testified that defendant had contacted her earlier on June 21, 2014, to reserve a room for the night. However, the hotel manager indicated that defendant and Roberts were regular customers.

military backgrounds.  She described how she went out to buy more alcohol, and that the next morning, when she saw defendant, he told her he had gotten to a brawl.

A few days after giving her first statement to police, Roberts was interviewed again; this time, the officers wanted her to focus on the events of Saturday.  Roberts again told the officers defendant had called her that day, and that she spoke to him in the morning; when she met up with him, defendant was drunk, belligerent, and not himself.  After ditching defendant following a trip to her storage unit, she met up with him again at the Jack-in-the-Box, where they got into an argument and went their separate ways.  However, she went with defendant to the Royal Plaza Inn that Saturday before noon.  Then she was dropped off at the La Casita restaurant in a white car.  Saavedra had talked to defendant and invited him over, so defendant showed up at the restaurant at about 8:00 p.m., but Saavedra was not there.  Roberts and defendant went to the store to purchase beer and got into another argument.  Roberts returned to the restaurant without defendant, and Saavedra had returned.  Saavedra told her they should go get the defendant if he were drunk, so Roberts went back and told defendant that Saavedra wanted to meet him.

In this second interview, Roberts repeated the information about Saavedra and defendant discussing their military service, Vietnam in particular, when she went out to purchase more alcohol.  When she returned, their voices were raised, but they were not physical. Roberts left to go to her camp, and defendant stayed at the restaurant.  She awoke at around 1:30 or 2:00 a.m. to go to the AM/PM market, where she saw defendant across the street at the Royal Plaza hotel.  His clothes were soaking wet, he told her he

8

could not find his phone, and said something about getting into a fight. Specifically, Roberts reported that he had said he had been in a bad fight and that he might have killed the man, that he had hurt him pretty bad. He also said he needed clothes. Also, during this second interview, Roberts stated defendant smelled like blood and that she thought she saw blood on his shoes. However, defendant was wearing sandals, according to the surveillance videos.

Roberts was interviewed a third time after the defendant's arrest. She told officers she had spoken by telephone with Charolette Sullivan, a long-time friend of defendant's and hers. In this interview, officers were again trying to clarify the events of Saturday, June 21, 2014. In this statement, Roberts told officers she had wanted to keep Saavedra's place a secret from defendant, although at trial she stated she wanted to keep it secret from Gardner.

Defendant asked his brother for a ride, but his brother declined. According to the brother's statement to police (which the brother refuted at trial), defendant told his brother he had done something bad and needed to leave. Defendant called his house-mate and coworker Susan Champion that he was leaving and would not be returning, although she denied this at trial. On Sunday, June 22, 2014, defendant asked his housemate and coworker Edward Cordero for a ride to Imperial Beach. Cordero frequently gave rides to defendant, who did not have a car. Cordero dropped defendant off at Imperial Beach and returned a short time later.

Defendant's longtime friend, Charolette Sullivan lived in Imperial Beach, and had invited defendant to visit over the Fourth of July weekend. However, defendant called to ask if he could come down earlier, and, when Sullivan agreed, defendant arrived that same day. Defendant appeared to be sad, and his hands appeared swollen, but he did not immediately mention being in a fight with anyone. He attributed the swelling to arthritis.

Eventually, defendant disclosed to Sullivan he had gotten into a fight with someone and had hit him, but that when the victim apologized, defendant stopped. However, afterwards, defendant stated that Roberts picked up some kind of club and started swinging at the man. Later, Roberts also called Sullivan, and more or less confirmed the defendant's version. Roberts told Sullivan that Saavedra had raped her and that defendant was upset about it. Roberts said that both defendant and Saavedra got really drunk and were talking about Marines stuff when Roberts mentioned to defendant that Saavedra had raped her in that same restaurant. Roberts indicated that she left, and when she did, the defendant and Saavedra got into a fight. Roberts indicated she went back later and bleached everything.

On June 28, 2014, police executed a search warrant of the residence of Sullivan, where they arrested defendant. In the garage where defendant was staying, there was a blue backpack and beach bag, along with a piece of paper that had writing on it. In the backpack, officers found a tie-dyed tee shirt and four Hawaiian shirts.

Following his arrest, defendant was interviewed. In the interview, defendant described how Cordero had dropped him off at the La Casita restaurant to meet Roberts,

10

where there was a man (the victim) defendant did not know. Roberts had told defendant she was staying at the restaurant in exchange for watching the restaurant. Roberts told defendant that the other man present had been raping her. The man admitting raping Roberts and said he was sorry. Defendant struck the man three or four times in the face, using his hands. Roberts then said that the man would never rape her again and began hitting the victim with a club or what appeared to the defendant to be a sledgehammer. Defendant took the object away from Roberts, but she retrieved it and resumed hitting the victim. Defendant took the weapon away a second time, threw it on the ground, asked her what she was doing, and then left. Defendant denied ever striking the victim with a weapon.

*Legal Proceedings*

Defendant was charged with one count of premeditated murder (Pen. Code, § 187, subd. (a))[4], along with personal use of a deadly weapon (§ 12022, subd. (b)(1)), and one prison prior. (§ 667.5, subd. (b).) Following a jury trial, defendant was convicted of first degree murder, but the jury did not make a true finding as to the weapon use allegation. The prison prior was dismissed, and defendant was sentenced to an indeterminate term of 25 years to life in prison. He appealed.

On February 27, 2017, in *Gentile I,* we reversed the conviction for first degree murder based on the California Supreme Court case of *People v. Chiu* (2014) 59 Cal.4th 155, and remanded the matter to the trial court for the People to elect whether to retry

---

[4] All further statutory references are to the Penal Code unless otherwise indicated.

11

defendant or accept a reduction in the degree of the offense, without reaching the remaining issues. On remand, the People accepted the reduction to second degree murder, and defendant was resentenced to an indeterminate term of 15 years to life. Defendant objected because there were five issues unaddressed.

Defendant filed his second appeal, raising the issues that had been left undecided in *Gentile I.* On November 15, 2018, we affirmed the judgment, but modified the sentence to reduce the court facilities assessments that were imposed. (*Gentile II, supra,* E069088.) Defendant petitioned the California Supreme Court for review, seeking a determination that the provisions of Senate Bill No. 1437 applied retroactively to cases not final on appeal.

On March 13, 2019, the Supreme Court granted review, transferred the matter to this court with directions to vacate our decision and reconsider the cause in light of Senate Bill No. 1437 (eff. Jan. 1, 2019) and our holding in the first appeal that it was probable the jury convicted defendant of murder on the theory that he aided and abetted Saundra Roberts in a target crime that, as a natural and probable consequence, resulted in her murder of the victim.

## DISCUSSION

In the first appeal, defendant relied on *Chiu, supra,* 59 Cal.4th 155, to argue that his first degree murder conviction should be reversed because the jury was instructed on an impermissible natural and probable consequences theory of liability. At trial, the jury had been instructed that it could convict defendant of first degree murder if it concluded

12

defendant directly committed the murder, or if it found he aided and abetted the perpetrator (Roberts) in committing the murder.  As to this second theory, the jury was further instructed that he could be convicted of first degree murder if he committed an aggravated assault on the victim (former § 245, subd. (a)(1)), while the coperpetrator committed an assault with a deadly weapon, and the victim died as a natural and probable consequence of the assault with a deadly weapon.  (*Gentile I, supra,* E064822, p. 12.) We agreed this was error in reversing and remanding.  We are now charged with determining whether the same error requires reversal of the second degree murder conviction.  We conclude the second degree murder conviction is proper.

In *Chiu,* the Supreme Court held that a defendant cannot be found guilty of first degree murder under the natural and probable consequences theory of accomplice liability.  (*Chiu*, *supra*, 59 Cal.4th p. 166.)  However, the Supreme Court did not hold that an aider or abettor could never be convicted of murder; it simply limited liability for first degree premeditated murder to offenders whose convictions were based on direct aiding and abetting principles.  (*Ibid.*)  As for aiders and abettors convicted under the natural and probable consequences theory, the Court held that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder.  (*Ibid.*)

Based on the reasoning of *Chiu*, we agreed that reversal was required in *Gentile I*, because the jury instructed on alternative theories of liability, one of which was improper: On one hand, according to the instructions and Roberts' testimony, the jury could

13

conclude the defendant directly and personally killed the victim and that Roberts was an accomplice after the fact. (*Gentile I, supra,* E064822, p. 11.) On the other hand, the jury could conclude defendant committed an aggravated assault while aiding and abetting Roberts' assault with a deadly weapon, the natural and probable consequences of which was to cause the victim's death. (*Id.,* at p. 12.) Reversal was required because we could not discern whether the conviction was based on a valid or invalid theory.

In the meantime, after the decision in *Gentile I*, and before *Gentile II* was decided, the Legislature passed Senate Bill No. 1437, amending the provisions of section 189 to add subdivision (e), in response to *Chiu*. After we filed our opinion in *Gentile II*, defendant requested by letter that we allow supplemental briefing on the retroactive applicability of Senate Bill No. 1437, which had not yet gone into effect, to his second degree murder conviction. (See *In re Estrada* (1969) 63 Cal.2d 740, 742; see also, *People v Martinez* (2019) 31 Cal.App.5th 719, 728.) We treated the letter as a petition for rehearing, but we declined the request as premature because Senate Bill No. 1437 would not go into effect until January 2019.

The amendment to section 189 provides, "(e) A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a

14

major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

In adopting this amendment, the Legislature indicated its purpose: "This bill would require a principal in a crime to act with malice aforethought to be convicted of murder except when the person was a participant in the perpetration or attempted perpetration of a specified felony in which a death occurred and the person was the actual killer, was not the actual killer but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree, or the person was a major participant in the underlying felony and acted with reckless indifference to human life." (Stats. 2018, ch. 1015, Sen. Bill No. 1437.) It only intended to prohibit murder convictions where the participant was not the actual killer or a direct aider or abettor of the murderer. (*Ibid.*)

In construing the amendment, we follow well settled principles governing statutory interpretation. ""Our role in construing a statute is to ascertain the Legislature's intent so as to effectuate the purpose of the law. [Citation.]'" [Citations.]" (*People v. Canty* (2004) 32 Cal.4th 1266, 1276.) If the language is clear and unambiguous, then we need go no further. (*Ibid.*) ""We select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citation.]"

(*People v. Hagedorn* (2005) 127 Cal.App.4th 734, 741.)  Defendant does not argue that the terms of the amendment are vague or ambiguous, so we do not tarry there.

In his supplemental letter brief, defendant argues that the amendment to section 189, "has now eliminated all murder liability, including second degree murder liability, based on the natural and probable consequences doctrine."  We disagree.  This argument proposes a construction of section 189, subdivision (e), which is contrary to the plain language of the statute, misconstrues the holding in *Chiu*, and would lead to absurd results.

As indicated, *Chiu* made clear that second degree murder liability is proportional to the culpability of an aider and abettor under the natural and probable consequences doctrine.  (*Chiu*, *supra,* 59 Cal.4th at p. 166.)  Additionally, the plain language of section 189, subdivision (e), expressly provides for murder liability in situations in which the defendant is the actual killer, or where the defendant was a "major participant" within the meaning of section 190.2, subdivision (d).  That subdivision authorizes imposition of the death penalty or imprisonment for life without possibility of parole for "every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons."

Contrary to defendant's interpretation, section 189, subdivision (e) does not eliminate all murder liability for aiders and abettors.  To the contrary, the amendment

16

expressly provides for both first and second degree murder convictions under appropriate circumstances. Defendant's construction would therefore conflict not only with the plain language of the statute, but also with the holding of *Chiu*, which also held that "[a]iders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles." (*Chiu, supra,* 59 Cal.4th at pp. 166-167, citing *People McCoy* (2001) 25 Cal.4th 1111, 1117–1118.) Considering the statement in *Chiu,* holding that under the natural and probable consequences theory, punishment for second degree murder is commensurate with a defendant's culpability, neither the Supreme Court nor the Legislature intended to relieve an aider-abettor entirely of liability for murder.

At a minimum, after reviewing the record, we conclude that defendant in this case was a direct or active aider and abettor. He actually delivered serious blows with his fists and feet to the victim at the urging of Roberts, and in one statement expressed fear that he may have killed the victim. His hands were swollen when he arrived in Imperial Beach, consistent with a beating by fists. Even if the jury believed defendant's testimony—that after his own beating of the victim he left the scene when Roberts began beating the victim with a deadly or dangerous weapon—the killing would have been the result of defendant's aggravated assault committed while directly aiding or abetting Roberts' assault with a deadly weapon.

In other words, he directly aided and abetted the murder of the victim by beating and now stands properly convicted of second degree murder. We addressed the problematic instruction that allowed the jury to find him guilty of first degree murder

17

under the natural and probable consequences theory in *Gentile I*.  The People thereafter accepted a reduction of degree to second degree murder, obviating any prejudice from the erroneous instruction.  The amended provisions of section 189, subdivision (e), did not prohibit this result, and the conviction for second degree murder is commensurate with defendant's culpability and conforms with the legislative intent underlying Senate Bill No. 1437 and the holding of *Chiu*.

The People argue that defendant is not entitled to have the merits of a Senate Bill No. 1437 claim in this appeal because he must first raise that claim in the trial court by way of a petition pursuant to Penal Code section 1170.95.  There is some support for this petition.  (See *People v. Carter* (2019) 34 Cal.App.5th 831,835; *People v. Anthony* (2019) 32 Cal.App.5th 1102,1147; *People v. Martinez* (2019) 31 Cal.App.5th 719, 724-728.)

However, none of those decisions were the result of a transfer from the California Supreme Court with directions to reconsider the cause in light of Senate Bill No. 1437.  For this reason, as well as reasons of judicial economy, we reach the merits and confirm our prior conclusion in this case (*Gentile II*, E069088, p. 3, fn. 2), that defendant was, at a minimum, an active aider-abettor who is not entitled to vacation of his murder conviction.

**DISPOSITION**

The judgment is affirmed.

CERTIFIED FOR PUBLICATION

RAMIREZ

P. J.

We concur:

McKINSTER

J.

CODRINGTON

J.